ZACHARY CANTOR (SBN 270507)
Cantor Law
510 Arizona Avenue
Santa Monica, CA 90401
Gen:    (213) 674-0325
Main:   (310) 826-6300
Fax:    (310) 820-1258
Web:    Cantorlawyers.com

RODNEY MESRIANI (SBN 184875)
Mesriani Law Group
510 Arizona Avenue
Santa Monica, CA 90401
Tel:    (310) 826-6300
Fax:    (310) 820-1258

Attorneys for Plaintiff TONIA DAVIS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TONIA DAVIS, an Individual;<br><br>Plaintiff,<br><br>vs.<br><br>TRANSPORTATION SECURITY ADMINISTRATION, a Federal Government Agency; Anthony Foxx, an Individual<br><br>Defendants. | CASE NO. **2:14-cv-05236**<br><br>**COMPLAINT FOR:**<br><br>1. **DISABILITY DISCRIMINATION;**<br>2. **DISABILITY HARASSMENT;**<br>3. **FAILURE TO PROVIDE REASONABLE ACCOMODATION OF A DISABILITY;**<br>4. **RETALIATION IN VIOLATION OF THE FMLA;**<br>5. **RETALIATION FOR REQUESTING A PROTECTED LEAVE;**<br>6. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;**<br>7. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND**<br>8. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.**<br><br>**DEMAND FOR JURY TRIAL** |

1

COMPLAINT

Plaintiff TONIA DAVIS, by and through her counsel, claims and alleges as follows:

## PARTIES

1.     Plaintiff, TONIA DAVIS (hereafter "Plaintiff"), is an individual who, at all times relevant to this action, resides in the City of Long Beach, County of Los Angeles, State of California.

2.     Plaintiff is informed, believes and thereupon alleges that Defendant TRANSPORTATION SECURITY ADMINISTRATION (hereafter "Defendant TSA"), is a federal government agency of the Department of Homeland Security, and was Plaintiff's employer at all times relevant.

3.     Plaintiff is informed, believes and thereupon alleges that Defendant Anthony Foxx, is the Secretary of Transportation.

4.     Plaintiff is informed, believes and thereupon alleges that each Defendant is, and at all times relevant herein was, the agent of his, her or its co-defendants, and in committing the acts alleged herein, was acting within the scope of his, her or its authority as such agent, with the knowledge, permission and consent of his, her or its co-defendants.

## GENERAL ALLEGATIONS

5.     By this reference, Plaintiff alleges and incorporates herein each and every allegation set forth in all previous paragraphs of the Complaint.

6.     In or around July 2006, Plaintiff began her employment with Defendant TSA as a Transportation Security Officer ("TSO") at the Long Beach Airport.  Plaintiff's duties as a TSO included but were not limited to:  assisting in conducting screening of passengers, baggage and cargo, assisting in monitoring the flow of passengers through screening checkpoints, and aiding in security of the public.

7.     In or around August 2008, Plaintiff also started working as a Program Analysis Assistant at Defendant TSA's Human Resources ("HR") Department.  As a Program Analysis Assistant, Plaintiff helped get badges for officers, collected information from the officers, assisted with parking badges, and helped run the lost and found.

8.     From August 2008 to November 2012, Plaintiff worked at Defendant TSA's HR

COMPLAINT

Department as a Program Analysis Assistant for four (4) days per week. Plaintiff worked at Defendant TSA's Long Beach Airport floor as a TSO for one (1) day per week. Defendant TSA's HR Department was a few blocks away from the Long Beach Airport floor.

9.    In or around 2011, Plaintiff started feeling sick. She had extreme headaches, fatigue, blurry vision, irritation of the eyes, and numbness in the arms and legs. Although Plaintiff never called in sick, she began going to the doctor's office every two weeks to get her blood drawn.

10.    In or around August 2011, Plaintiff was diagnosed by her doctor with high blood pressure.

11.    Later in 2011, Plaintiff was diagnosed with diabetes. Indeed, Plaintiff had gained substantial weight over the last few years, and was now significantly overweight.

12.    Plaintiff continued to go to doctor's appointments every other week for treatment and blood work. Plaintiff would produce her doctor's appointments to her supervisors in the HR Department. However, over time, Plaintiff began to notice that Cathy Bridges' facial expressions would change when Plaintiff asked to go to her doctor's appointments. Cathy Bridges appeared to be less sympathetic and more annoyed at Plaintiff's requests to go to doctor's appointments. Indeed, Cathy Bridges began questioning Plaintiff about her frequent doctor's visits by saying, "You are going *again*?" She asked Plaintiff why she was going to her doctor so often, even though Plaintiff had already provided the necessary paperwork to allow her to go to the doctor's appointments.

13.    In or around November 2012, Defendant TSA took away Plaintiff's Program Analysis Assistant job in HR, and moved her back permanently to the Long Beach Airport floor, where she was asked to work as a TSO everyday again. Plaintiff enjoyed the HR job and did not want to be moved back to working as a TSO full time. Nonetheless, she was moved back to the TSO position permanently.

14.    On or about March 22, 2013, Plaintiff was diagnosed with a tumor on her adrenal gland. Plaintiff spent her day off on Tuesday in pre-opt. Then she took the following week off because it was her scheduled vacation week.

15.    In or around early April 2013, Plaintiff returned to work at Defendant TSA for a two (2) week period before her upcoming surgery date.

16.    Then, on or about April 25, 2013, Plaintiff had two surgeries simultaneously. The first surgery was the removal of the tumor on her adrenal gland. The second surgery was a Gastric Sleeve operation for obese patients.

17.    Plaintiff was initially only supposed to be on FMLA until May 26, 2013. However, while Plaintiff was on bed rest during this period of time, Plaintiff had complications with her surgery. Specifically, Plaintiff was readmitted to the hospital because she could not keep nutrients in her body. As a result, Plaintiff received a P.I.C. line in her left arm so she could get fluids. This caused Plaintiff's FMLA leave to be extended.

18.    In or around early June 2013, Plaintiff visited Cathy Bridges while still on FMLA leave to bring Defendants her medical documents and to show them the P.I.C. line on her arm so they knew that her request for an FMLA extension was legitimate.

19.    Later in June 2013, Plaintiff developed blood clots from the P.I.C. line. Subsequently, Plaintiff was prescribed with Coumadin to remove the blood clots. Since the Coumadin was a blood thinner, it made Plaintiff feel week and dizzy at times.

20.    On or about July 19, 2013, Plaintiff returned to work at Defendant TSA from her FMLA leave. Plaintiff was still on the Coumadin prescription when she returned to work. Plaintiff was also taking Vicodin to curb the pain from her surgery and blood clots.

21.    Immediately after she returned to work, several employees of Defendant TSA commented on how Plaintiff "did not look well." Fellow TSO officers told her that she looked like she had lost a lot of weight and that she did not have her "glow" anymore. Indeed, Plaintiff still felt weak and nauseous upon her return. Plaintiff had initially wanted to stay out of work longer, but she had almost run out of leave of absences and needed the money for her family.

22.    During the next several days, still in or around July 2013, Plaintiff was confronted by two (2) employees of Defendant TSA – LTSO Jessie Garcia and TSO Shawnte Mayes – both of whom offered to give her some of their sick hours so she could go home and rest. Clearly, many employees of Defendant were worried about her health. Plaintiff was informed that

Defendant TSA employees could transfer some of their sick days to other employees when those latter employees ran out of leaves of absences. Plaintiff was grateful that the two (2) employees were willing to give her much needed hours.

23.    On or about July 23, 2013, Plaintiff went to Cathy Bridges in her office. Cathy Bridges looked at Plaintiff and conceded that Plaintiff "did not look well" and that maybe Plaintiff "came back to soon." Plaintiff informed Cathy Bridges that two (2) other co-workers had offered to give her some of their sick days so she could medically rest without losing her few remaining leaves of absence. But Cathy Bridges denied Plaintiff these extra sick days. Cathy Bridges said that Plaintiff could only use the other employees' days when she ran out of leaves of absence days herself; and since she still had a few remaining, Defendant TSA could not accommodate her request.

24.    From July 19, 2013 to late August 2013, Plaintiff suffered approximately one (1) dizzy spell per week at her job. These episodes almost always occurred in the morning. They involved Plaintiff feeling dizzy and light headed while she was standing on the floor. Subsequently, Plaintiff would sit and rest in the break room for five (5) to ten (10) minutes, and then feel good enough to return to work for the rest of the day.

25.    Plaintiff's co-workers and supervisors became concerned for Plaintiff's health. For example, on one day in or around August 2013, Plaintiff's supervisor Marie Hayes asked Plaintiff to come outside of the airport with her during her break. Ms. Hayes took Plaintiff behind an old wall so they had privacy. Then, Ms. Hayes expressed concern that Plaintiff was having dizzy spells at work. Plaintiff informed Ms. Hayes that her medical condition only allowed her to eat small amounts of food. Plaintiff requested that she needed to have more time to eat smaller portions and that one rest break was not adequate because she could not gulp down all her food at once. Plaintiff was also aware that other employees had tried to eat snacks from their pockets during work, and had been caught and reprimanded or even fired. Plaintiff was afraid that if she tried to snack without approval, she would be terminated. Even though Plaintiff requested to her supervisor that she be allowed to eat smaller snacks over her entire work period, Defendant TSA did not accommodate this request.

26.     On or about August 1, 2013, Plaintiff was loading bags on Lane 6 when she pushed a passenger's bag on the rollers to the black belt for it to be screened. The bag was a lot heavier than Plaintiff anticipated. After she pushed the bag on the rollers, Plaintiff felt a sharp pain go up her left arm to her shoulder. Further, Plaintiff felt her arm/shoulder area pop. Plaintiff grabbed her shoulder and stepped back. Officer Klebba was on the walkthrough when he noticed Plaintiff grabbing her shoulder. Officer Klebba asked Plaintiff if she was alright. Plaintiff shook her head and answered, "No." Officer Klebba told Plaintiff that she should say something to someone. However, Plaintiff shook her head because she was afraid that she had already taken the maximum time off for her surgeries. Plaintiff had heard from other co-workers that if you got hurt on the job, you should not disclose the injury or you could get in trouble. Particularly, Plaintiff had seen one of her friend co-workers crying because she had been written-up for missing work even though she was extremely sick. The friend told Plaintiff that she "should not have to be in fear for calling in sick." Plaintiff was worried that if Defendant TSA found out she wanted to take extra time off, Defendant would terminate her.

27.     For the next couple of weeks, still in August 2013, Plaintiff tried to work with the pain in her left arm and shoulder. However, the pain was considerable and Plaintiff had a very difficult time lifting her arm.

28.     On or about August 19, 2013, Plaintiff came to work with her arm down by her side because she could not lift it. Officer Mayes asked Plaintiff what was wrong, and Plaintiff explained to her about the injury she had previously incurred on or about August 1, 2013. Officer Mayes had to assist Plaintiff take off her coat. Later, at around 10:00 A.M., Plaintiff was divesting on a low rush. A pregnant woman came in and Plaintiff asked her if she needed help with her suitcase to put on the belt. The pregnant woman answered "yes." Plaintiff walked around and lifted the suitcase off the floor to the table. Plaintiff felt more discomfort in her arm. LTSO Brian Wycoff saw Plaintiff's discomfort and asked her why she did not call him to assist her. Plaintiff responded that she did not see Mr. Wycoff or else she would have asked for assistance.

29.     Also, on or about August 19, 2013, Plaintiff suffered another dizzy spell while at

COMPLAINT

1    work. Plaintiff rested for five (5) to ten (10) minutes and then informed her supervisor that she

2    was fine to continue working. But her supervisor decided to pull Plaintiff off the floor rather

3    than giving Plaintiff limited or light duty. Thereafter, Plaintiff met with Defendants Bridges and

4    Kuewa to discuss concerns about her fitness for duty due to the dizzy spells. The meeting lasted

5    nearly three (3) hours and consisted of Defendants Bridges and Kuewa drilling Plaintiff with

6    constant questions about her medical condition, symptoms, potential recovery dates, and

7    medication. Plaintiff was intimidated and overwhelmed by the questions, and began crying.

8    Plaintiff indicated that she was scared that she would get terminated because she had no more

9    leave of absence credits due to her recent FMLA leave for surgery. Even with Plaintiff crying,

10    Defendants continued to interrogate Plaintiff about her dizzy spells for a lengthy period of time.

11    Cathy Bridges informed Plaintiff that she would have to provide Defendant TSA with all her

12    medical information to determine if Plaintiff's dizziness was a temporary or permanent

13    condition. At this point, Plaintiff made a conscious decision not to tell Defendants Bridges and

14    Kuewa about her left arm and shoulder injury because she did not want to endure further

15    harassing questions nor increase her chances of being terminated.

16         30.    On or about the night of August 20, 2013, Plaintiff tried to sleep but could not

17    because the pain in her left arm and shoulder was unbearable. Plaintiff's injury had resulted in

18    her left arm being immobile.

19         31.    On or about August 21, 2013, on her day off from work, Plaintiff visited Jean R.

20    Campos (N.P.) at Kaiser Permanente for a medical diagnosis and treatment of her arm and

21    shoulder. Plaintiff took X-rays and was given a sling to support her left arm. Plaintiff was also

22    ordered to take the next two (2) weeks off from work to rest her arm. After the medical

23    appointment, Plaintiff called manager Monique Rodriguez and informed her about her work-

24    related injury and that Kaiser required her to take two (2) weeks off from work. Ms. Rodriguez

25    told Plaintiff to stay off of work as the doctor requested. Ms. Rodriguez further told Plaintiff to

26    come in to work on August 23, 2013 just to fill out workers' compensation forms with her

27    supervisor Jeremy Patterson.

28         32.    On or about August 22, 2013, James Tiampo sent Plaintiff a letter asking Plaintiff

1    for detailed medical documentation and an assurance from her doctor that she could perform the

2    full range of her TSO duties.  James Tiampo also asked for a list of Plaintiff's restrictions and an

3    expected duration of those restrictions while on duty.  James Tiampo stated that Plaintiff must

4    submit her medical documentation to Defendant TSA no later than September 4, 2013.

5        33.    On or about August 23, 2013, Plaintiff went to Supervisor Jeremy Patterson and

6    spent approximately three (3) hours [from 7:00 A.M. to 10:00 A.M.] filling out workers'

7    compensation forms.  During the process, Mr. Patterson told Plaintiff, "You know Cathy Bridges

8    is going to fight it."  Plaintiff asked Mr. Patterson for clarification.  Mr. Patterson again reiterated

9    that Cathy Bridges had told him that Bridges was going to fight Plaintiff's workers'

10    compensation claim.  Plaintiff felt very anxious that her job may be in jeopardy because she

11    notified the company of her injury.  After filling out the forms, Plaintiff went home and

12    continued her medical leave.

13        34.    On or about August 24, 2013, Plaintiff's husband received a call from a manager

14    of Defendant TSA asking if Plaintiff was going to come in to work.  Plaintiff's husband relayed

15    the message to Plaintiff.  Plaintiff called the manager back and explained that she had a work-

16    related injury and was on medical leave.  The manager apologized but said he had not been

17    notified by Defendant TSA of the injury.  Plaintiff was very anxious and did not want to get

18    written up, so she offered to come in to work the next day to provide additional paperwork.

19    Ultimately, the manager called Plaintiff back and told her that her paperwork had been filed, and

20    that she no longer needed to come in to work.  Still, this was particularly stressful for her.

21        35.    On or about August 27, 2013, Plaintiff contacted Teresa Kuewa and informed her

22    that although she could not move her left arm, she wanted to withdraw her workers'

23    compensation claim.  Plaintiff did not want to risk being retaliated against and decided that she

24    could stay on medical leave for a short period of time until her injury adequately recovered.

25        36.    On or about September 5, 2013, Plaintiff returned to work for Defendant TSA.

26    Upon her return, Plaintiff was ostracized and harassed by many of her TSO co-workers.  For

27    example, fellow TSA officers would stay away from Plaintiff and not talk to her.  On other

28    occasions, co-workers would refuse to help Plaintiff when she called for bag checks.  Plaintiff

COMPLAINT

1  also discovered that there was a rumor going around the workplace that Plaintiff was "faking"

2  her injury.  Plaintiff was also confronted by several female TSOs who expressed their anger with

3  Plaintiff that her arm was in a sling.  Plaintiff believes the female officers were:  Jennifer Coles,

4  Felicia Clatyon, and Mia.  One of the officers indicated that she had injured her shoulder in the

5  past but had never put it in a sling or told Defendant TSA about her injury.  She asked Plaintiff

6  "Why did you tell them about your injury?"  Then, the officer said, "I wouldn't report it if I were

7  you."  Another officer informed Plaintiff that she had been injured but never told Defendant TSA

8  because she was scared of retaliation.  One of the officers also told Plaintiff, "I would never

9  report my injury.  You see why now, right?"

10         37.    Later, on or about September 5, 2013, Teresa Kuewa informed Plaintiff that she

11  would not be paid if she worked on light duty.  Teresa Kuewa stated that employees put on light

12  duty for a non-work related injury, and who had no more leaves of absence, could not work for

13  pay.  Plaintiff complained that her injury was a work-related injury, and did not understand why

14  she could not get paid while on limited duty.  Plaintiff could not afford to work without pay.  She

15  informed Teresa Kuewa that she had promised to give her paycheck to her daughter for college,

16  and could not be in a non-pay status.  Ultimately, Plaintiff was forced to re-file her workers'

17  compensation claim and requested to be placed on limited duty.

18         38.    Later in or around September 2013, Cathy Bridges asked Plaintiff to remove her

19  sling from her left arm because the sling was not part of her uniform.  Plaintiff complained to

20  Cathy Bridges that she was waiting for the results of an MRI to come back so that her doctor

21  could clear her to use the arm again.  Nonetheless, Plaintiff was instructed to remove the sling

22  and did so.

23         39.    On or about September 16, 2013, Plaintiff was working on the floor when she

24  began to feel light headed.  The sun was beating down on Plaintiff through the window and

25  making her feel dizzy.  Someone else from Defendant TSA was supposed to tap out Plaintiff

26  after her 45 minute shift, but the person was apparently unavailable and Plaintiff was forced to

27  work longer than 45 straight minutes.  Plaintiff asked other members of her team if someone

28  could tap her out of the rotation because she was feeling light headed, but she was told to wait a

COMPLAINT

1  little longer and someone would tap her out.  Then, Plaintiff called on her radio for supervisor

2  assistance at her position, but no one showed up at first.  Plaintiff turned to a passenger and told

3  the passenger that she felt light headed.  The passenger told Plaintiff that she did not look well.

4  Then the passenger asked for another passenger to help out, because the first passenger was

5  carrying a child.  Meanwhile, one of the Long Beach police officers heard Plaintiff over the radio

6  and came to her assistance.  The officer called 911.  Plaintiff told the officer that she did not need

7  an ambulance, and that she only needed to sit down and rest for 5-10 minutes away from the sun.

8  Still, James Tiampo showed up at the site with a wheel chair, and ordered Plaintiff to sit in the

9  wheel chair.  Plaintiff was then wheeled to Cathy Bridges office.  Plaintiff was questioned about

10  the incident and her medical condition.  Cathy Bridges reissued a letter to Plaintiff asking her to

11  submit her medical documentation to Defendant TSA no later than September 23, 2013.

12      40.    Later on or about September 16, 2013, Plaintiff went to her doctor who diagnosed

13  her with Near Syncope.  Then, on or about September 17, 2013, Plaintiff presented Defendant

14  TSA with the medical documentation.  Defendant TSA asked for more proof of Plaintiff's

15  medical history, which Plaintiff also provided.

16      41.    On or about October 26, 2013, Plaintiff injured her right arm while pulling a

17  passenger's bag out of the tunnel.  At this point, Plaintiff had primarily used her right arm to do

18  the work duties since her left arm was still injured.  A co-worker named Jasmine asked Plaintiff

19  if she was ok, and Plaintiff asked Jasmine if she could retrieve a supervisor or manager because

20  Plaintiff needed to inform a higher-up about her injury.  Jasmine tried to get the supervisor but

21  the supervisor was busy on the phone.  Then, Plaintiff was tapped out by another officer.

22  Plaintiff then went and reported the injury to both Supervisor Steffens and Manager Boyd.

23  Manager Boyd filed the report on the same day.

24      42.    On or about November 7, 2013, Plaintiff received MRI clearance from Kaiser

25  Permanente to return back to full duty for Defendant TSA.

26      43.    On or about November 8, 2013, Plaintiff arrived at work and gave the information

27  to her manager on duty at around 5:00 A.M.  Although Cathy Bridges routinely arrived to work

28  at 4:30 A.M. or 5:00 A.M., Plaintiff did not hear anything from Defendants until 10:00 A.M.

when she was called into the manager's office at the trailer while beginning to take her lunch break.  There, Plaintiff was presented with paperwork by manager Monique Rodriguez and Cathy Bridges for her notice of proposed removal from Defendant TSA.  Specifically, Plaintiff was told to take the rest of the day off, and to exhaust the rest of her leave and sick time. Plaintiff was distraught and started crying.  Cathy Bridges hugged Plaintiff but then whispered in her ear, "Now you can file for unemployment."

44.    On or about November 13, 2013, Plaintiff provided a written rebuttal to Defendant's management decision to remove her.

45.    On or about November 15, 2013, Plaintiff filed an EEOC complaint against Defendant TSA for disability discrimination and harassment.

46.    On or about November 21, 2013, Plaintiff received a letter from James Tiampo indicating that Plaintiff was to be permanently terminated from Defendant TSA on November 26, 2013.  Defendants stated that Dr. Neal L. Presant, M.D., M.P.H., from Department of Health and Human Services, reviewed Plaintiff's medical documentation and discussed Plaintiff's adrenal tumor surgery with Dr. Amy Whittaker.  According to Defendants, Dr. Presant opined that Plaintiff had "persistent endocrine problems related to [her] low blood potassium and likely to [her] attacks of dizziness" which would medically disqualify her from the TSO position under the Endocrine Disorder guideline.

47.    On or about December 18, 2013, Plaintiff appealed to the Office of Professional Responsibility (OPR) Appellate Board asking to reverse the termination decision made by Defendant.

48.    On or about January 13, 2014, prior to the OPR Appellate Board's decision, Board-Certified Endocrinologist Vanessa Sarah Ghaderi M.D., who had been treating Plaintiff since December 2012 and had diagnosed Plaintiff with the tumor in her adrenal gland, wrote a letter for Plaintiff.  Dr. Ghaderi stated in the letter that contrary to Defendant TSA's assertion, Plaintiff did not have any electrolyte disturbances since August 20, 2013.  Dr. Ghaderi also opined that she did "not see a reason from an endocrinologic standpoint for why [Plaintiff] cannot perform her duties as a TSA officer."  Plaintiff received the letter several days later and

1  immediately submitted the letter to the OPR Appellate Board for her appeal on January 21, 2014.

2      49.    On or about January 23, 2014, the OPR Appellate Board denied Plaintiff's appeal.

3  The Board's decision stated that Plaintiff "did not address" her endocrine condition.  Plaintiff

4  emailed the OPR indicating that she had sent Dr. Ghaderi's letter which directly addressed the

5  endocrine issue.  However, OPR indicated that Plaintiff had submitted the letter too late, and it

6  was thus not addressed in the decision.

7      50.    On or about February 7, 2014, Plaintiff submitted a request for reconsideration to

8  the OPR Appellate Board.

9      51.    On or about March 6, 2014, the OPR Appellate Board denied Plaintiff's request

10  for reconsideration despite the fact that the earlier Board's decision did not take into account Dr.

11  Ghaderi's note that Plaintiff's endocrinological system should not have affected her TSO duties.

12      52.    Consequently, Plaintiff filed complaints of disability discrimination and

13  harassment with the California Department of Fair Employment and Housing (DFEH) on April

14  15, 2014, and received her Right-To-Sue Notice issued on the same date. A true and accurate

15  copy of Plaintiff's Right-To-Sue Notice is attached hereto as Exhibit 1.  The Right-To-Sue

16  Notice was thereafter amended on May 6, 2014.  A true and accurate copy of Plaintiff's

17  Amended Right-To-Sue Notice is attached hereto as Exhibit 2.

18  **FIRST CAUSE OF ACTION**

19  **DISABILITY DISCRIMINATION**

20  **AGAINST DEFENDANT TSA**

21      53.    Plaintiff re-alleges and incorporates herein by this reference each and every

22  allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

23      54.    Plaintiff was at all times hereto an "employee" within the meaning of 29 U.S.C.A.

24  § 794(a) and 42 U.S.C.A. § 12111(4), which prohibit disability discrimination in employment.

25      55.    Defendant TSA was at all material times an "employer" as defined by 29

26  U.S.C.A. § 794(b) and 42 U.S.C.A. § 12111(5), and, as such, was barred from discriminating in

27  employment decisions on the basis of disability, as set forth in 29 U.S.C.A. § 794(a) and 42

28  U.S.C.A. §§ 12112 (a) and (b).

COMPLAINT

56.     Defendant TSA has discriminated against Plaintiff on the basis of his disability in violation of 29 U.S.C.A. §§ 794(a) and (d), 42 U.S.C.A. §§ 12112(a) and (b) and related statutes, by engaging in the course of conduct more fully set forth in the General Allegations and all paragraphs stated above.

57.     As a result of Defendants TSA's unlawful discrimination against Plaintiff, Plaintiff has suffered and continues to suffer (a) substantial humiliation, serious mental anguish, emotional and physical distress; and (b) loss of past and future earnings, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages. The exact amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

58.     As more fully set forth above, the disability discrimination by Defendant TSA was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff. Such acts amounted to oppression, fraud, and malice.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendant.

## SECOND CAUSE OF ACTION

### DISABILTY HARASSMENT

### AGAINST ALL DEFENDANTS

59.     Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

60.     Plaintiff was at all times hereto an "employee" within the meaning of 29 U.S.C.A. § 794(a) and 42 U.S.C.A. § 12111(4), which prohibit disability discrimination in employment.

61.     Defendant TSA was at all material times an "employer" as defined by 29 U.S.C.A. § 794(b) and 42 U.S.C.A. § 12111(5) and, as such, was barred from discriminating in employment decisions on the basis of disability, as set forth in 29 U.S.C.A. § 794(a) and 42 U.S.C.A. §§ 12112 (a) and (b).

62.    Defendants Bridges, Kuewa and Tiampo were managerial or supervisory employees of Defendant TSA and as such, owed a duty to the Plaintiff to refrain from engaging in harassment and to take all reasonable steps to prevent and correct unlawful disability discrimination and harassment in the workplace.

63.    Defendants harassed Plaintiff on the basis of disability, in violation of 29 U.S.C.A. §§ 794(a) and (d), 42 U.S.C.A. §§ 12112(a) and (b) and related statutes by creating a hostile work environment and engaging in the course of conduct more fully set forth in the General Allegations stated above.

64.    As a proximate result of Defendants' harassment of Plaintiff, Plaintiff has suffered (a) humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and future earnings and employment benefits and opportunities; all on account of which Plaintiff is entitled to compensatory damages. The amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

65.    As more fully set forth above, the disability harassment by Defendants was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff. Such acts amounted to oppression, fraud, and malice. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## THIRD CAUSE OF ACTION

### FAILURE TO PROVIDE REASONABLE ACCOMMODATION OF A DISABILITY AGAINST DEFENDANT TSA

66.    Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

67.    Plaintiff was at all times hereto an "employee" within the meaning of 29 U.S.C.A. § 794(a) and 42 U.S.C.A. § 12111(4), which prohibit disability/medical condition

1  harassment/discrimination in employment.

2      68.    Defendant TSA was at all material times an "employer" as defined by 29

3  U.S.C.A. § 794(b) and 42 U.S.C.A. § 12111(5), and, as such, was barred from

4  harassing/discriminating against Plaintiff on the basis of disability, perceived disability, or

5  medical condition possessed or thought to be possessed by an employee, as set forth in 29

6  U.S.C.A. § 794(a) and 42 U.S.C.A. § 12112 (a) and (b).

7      69.    During Plaintiff's employment with Defendant TSA, she was suffering from a

8  condition that substantially limits her major life activities.

9      70.    Despite having notice of Plaintiff's condition, and notice of Plaintiff's request for

10  to return to work, failed to provide Plaintiff with a reasonable accommodation for the above

11  health condition by denying employment and ultimately terminating her employment in violation

12  of 42 U.S.C.A. § 12111(9) and 42 U.S.C.A. § 12112(b)(5).

13      71.    As a result of Defendant's failure to provide reasonable accommodation to

14  Plaintiff for her known disabilities, Plaintiff has suffered and continues to suffer (a) substantial

15  humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and

16  future earnings, and employment benefits and opportunities, on account of which Plaintiff is

17  entitled to compensatory damages.  The exact amount and nature of such damages exceed the

18  jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek

19  leave to amend this Complaint upon ascertaining such information, or will prove the same at the

20  time of trial.

21      72.    As more fully set forth above, Defendant TSA's failure to provide reasonable

22  accommodation for Plaintiff's known disabilities was committed intentionally, maliciously,

23  wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff's rights and

24  with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by

25  Plaintiff.  Such acts amounted to oppression, fraud, and malice.  Plaintiff is therefore entitled to

26  punitive or exemplary damages in an amount sufficient to punish and make an example out of

27  Defendant.

28  **FOURTH CAUSE OF ACTION**

## RETALIATION IN VIOLATION OF FMLA

## AGAINST DEFENDANT TSA

73.    Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

74.    Under the Family and Medical Leave Act ("FMLA"), it is an unlawful employment practice for an employer to refuse to grant a request by any employee to take up to 12 workweeks in any 12 month period for family and medical leave.  It is an unlawful employment practice for the employer to fail to guarantee, to each employee taking family or medical leave employment in the same or comparable position at the end of the family or medical leave.  It is an unlawful employment practice for an employer to refuse to hire, to discharge, fine, suspend, expel, discrimination or harass an employee because of an employee's exercise of the right to family care and medical leave.

75.    At all times mentioned in this complaint, Defendant TSA is an employer within the meaning of 29 U.S.C.A. § 2611(4) and employed more than 50 employees in a 75 mile radius of plaintiff's place of work.

76.    Plaintiff's protected status under 29 U.S.C.A. § 2612(a) is Plaintiff's exercise of and/or attempts to exercise family and/or medical leave rights. Plaintiff complied with all applicable notice requirements, if any, of Defendant TSA, and of the FMLA.

77.    Defendant TSA knew, perceived, and/or believed that Plaintiff had the aforementioned protected status, described hereinabove.

78.    Defendant TSA failed and refused to comply with the FMLA, as described hereinabove.  Defendant TSA failed to guarantee Plaintiff's employment in the same or comparable position at the end of family or medical leave; and/or refused to hire, discharged, fined, suspended, expelled, demoted, constructively discharged, refused to promote, failed to reinstate, discriminated against and/or harassed Plaintiff because of Plaintiff's exercise of and/or attempts to exercise family and/or medical leave rights.

79.    Plaintiff's exercise of and/or attempts to exercise family and medical leave was a motivating factor in Defendant TSA's aforementioned decisions that were adverse to Plaintiff.

1   Plaintiff's exercise of and/or attempts to exercise family and medical leave was a motivating

2   factor in Defendant TSA's aforementioned decision to actually refuse to hire Plaintiff; refuse to

3   employ Plaintiff, failure to reinstate Plaintiff, failure to guarantee Plaintiff's employment in the

4   same or similar position after family and medical leave, discriminate against Plaintiff, fine

5   Plaintiff, suspend Plaintiff, and/or harass Plaintiff.

6          80.    As a direct, legal, and proximate cause of Plaintiff's aforementioned protected

7   status, Defendant discriminated and harassed Plaintiff by engaging in the course of conduct set

8   forth in the General Allegations and all paragraphs stated above, amongst other things.

9          81.    As a result of Defendant's above referenced discrimination, harassment, and

10  retaliation, Plaintiff has suffered and continues to suffer (a) substantial humiliation, serious

11  mental anguish, and emotional and physical distress; and (b) loss of past and future earnings, and

12  employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory

13  damages.  The exact amount and nature of such damages exceed the jurisdictional limits of this

14  court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint

15  upon ascertaining such information, or will prove the same at the time of trial.

16         82.    As more fully set forth above, Defendant TSA's above referenced discrimination,

17  harassment, and retaliation was committed intentionally, maliciously, wantonly, oppressively,

18  and fraudulently with a conscious disregard for Plaintiff's rights and with the intent to vex,

19  injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff.  Such acts

20  amounted to oppression, fraud, and malice. Plaintiff is therefore entitled to punitive or exemplary

21  damages in an amount sufficient to punish and make an example out of Defendant.

22                          **FIFTH CAUSE OF ACTION**

23              **RETALIATION FOR REQUESTING A PROTECTED LEAVE**

24                          **AGAINST DEFENDANT TSA**

25         83.    Plaintiff alleges and incorporates herein by this reference each and every

26  allegation set forth in all previous paragraphs of the Complaint.

27         84.    Under the Rehabilitation Act, referring to the Americans with Disabilities Act

28  ("ADA"), 29 U.S.C.A. § 794(a) and (d), 42 U.S.C.A. § 12203 et. seq., it is an unlawful

1  employment practice for an employer to discharge, expel, or otherwise discriminate against any

2  person because the person has opposed any practices forbidden under the Fair Employment and

3  Housing Act.

4      85.    Under the Rehabilitation Act, referring to the Americans with Disabilities Act

5  ("ADA"), 29 U.S.C.A. §§ 794(a) and (d), 42 U.S.C.A. §§ 12112(a) and (b) et. seq., it is an

6  unlawful employment practice for an employer, because of a person's disability, to bar or

7  discharge the person from employment or from a training program leading to employment, or to

8  discriminate against the person in compensation or in terms, conditions, or privileges of

9  employment.

10     86.    It is unlawful, under the Rehabilitation Act, referring to the Americans with

11  Disabilities Act ("ADA"), 29 U.S.C.A. §§ 794(a) and (d), 42 U.S.C.A. §§ 12111(9) and 42

12  U.S.C.A. § 12112(b)(5), for an employer to fail to make reasonable accommodation for the

13  known physical or mental disability of an employee.

14     87.    Defendant TSA made decisions adverse to the Plaintiff in regards to

15  compensation and terms, conditions and privileges of employment.  Defendant actually

16  terminated Plaintiff, refused to employ Plaintiff, and/or failed to reinstate Plaintiff in the terms,

17  conditions, and privileges of employment, and harassed Plaintiff.

18     88.    Plaintiff's aforementioned protected activity, as described hereinabove, was a

19  motivating factor in Defendant's decisions that were adverse to Plaintiff, in regard to

20  compensation and terms, conditions and privileges of employment.

21     89.    As a direct, legal, and proximate cause of Plaintiff's aforementioned protected

22  status, described hereinabove, Defendant retaliated against plaintiff including, but not limited to,

23  the following ways:  harassed and discriminated against Plaintiff; issued false write-ups to

24  Plaintiff; wrongfully suspended Plaintiff; and wrongfully terminated Plaintiff's employment.

25     90.    As a result of Defendant's retaliation of Plaintiff, Plaintiff has suffered and

26  continues to suffer substantial (a) humiliation, serious mental anguish, and emotional and

27  physical distress; and (b) loss of past and future earnings, and employment benefits and

28  opportunities, on account of which Plaintiff is entitled to compensatory damages.  The exact

1  amount and nature of such damages exceed the jurisdictional limits of this court, but are

2  presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon

3  ascertaining such information, or will prove the same at the time of trial.

4      91.    As more fully set forth above, Defendant's retaliatory acts were committed

5  intentionally, maliciously, wantonly, and oppressively, with a conscious disregard of Plaintiff's

6  rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries

7  sustained by Plaintiff.  Plaintiff is therefore entitled to punitive or exemplary damages in an

8  amount sufficient to punish and make an example out of Defendant.

9                        **SIXTH CAUSE OF ACTION**

10         **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

11                        **AGAINST DEFENDANT TSA**

12     92.    Plaintiff alleges and incorporates herein by this reference each and every

13  allegation set forth in all previous paragraphs of the Complaint.

14     93.    As a result of Defendant TSA's unlawful harassment and discrimination of

15  Plaintiff, Defendant wrongfully terminated Plaintiff's employment on November 26, 2013, in

16  violation of 29 U.S.C.A. §§ 794(a) and (d), and 42 U.S.C.A. §§ 12112 (a) and (b)

17     94.    The aforementioned acts of Defendant TSA constitute wrongful termination in

18  violation of public policy.

19     95.    As a result of Defendant TSA's wrongful conduct, Plaintiff has suffered and

20  continues to suffer substantial humiliation, serious mental anguish, and emotional and physical

21  distress, on account of which Plaintiff is entitled to compensatory damages.  The exact amount

22  and nature of such damages are presently unknown to Plaintiff, who will either seek leave to

23  amend this Complaint upon ascertaining such information, or will prove the same at the time of

24  trial.

25     96.    As more fully set forth above, the acts of Defendants were intentional, malicious,

26  wanton, oppressive, and fraudulent, with a conscious disregard for Plaintiff's rights and with the

27  intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff.

28  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish

1    and make an example out of Defendant.

2    \\\

3    \\\

4    \\\

5    ## SEVENTH CAUSE OF ACTION

6    ## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

7    ### AGAINST ALL DEFENDANTS

8    97.    Plaintiff alleges and incorporates herein by this reference each and every

9    allegation set forth in all previous paragraphs of the Complaint.

10    98.    Defendants engaged in disability discrimination and harassment against Plaintiff,

11    aided and abetted each other in engaging in illegal discrimination and harassment, thereby

12    subjecting Plaintiff to the intentional infliction of emotional distress caused by such

13    discrimination and harassment in violation of 29 U.S.C.A. §§ 794(a) and (d), and 42 U.S.C.A.

14    §§ 12112 (a) and (b).

15    99.    As more fully set forth in the General Allegations and all paragraphs above,

16    Defendants engaged in unconscionable disability discrimination against Plaintiff, including

17    subjecting Plaintiff to the intentional infliction of emotional distress caused by such

18    discrimination in violation of 29 U.S.C.A. §§ 794(a) and (d), and 42 U.S.C.A. §§ 12112 (a) and

19    (b).

20    100.    The acts of Defendants as described herein were extreme and outrageous and

21    represent an abuse of each of the Defendants' authority and position. Such conduct was intended

22    to cause severe emotional distress, or was done with conscious disregard for the probability of

23    causing such distress. Such conduct exceeded the inherent risks of employment and was not the

24    sort of conduct normally expected to occur in the workplace. Defendant TSA and its employees,

25    the above-named individual Defendants, abused their positions of authority toward Plaintiff and

26    engaged in conduct intended to humiliate Plaintiff and convey the message that she was

27    powerless to defend her rights.

28    101.    As a proximate result of the aforementioned acts, Plaintiff has suffered

COMPLAINT

1  embarrassment, anxiety, humiliation, serious mental anguish and emotional and physical distress.

2  Plaintiff will continue to suffer damages in a sum that exceeds the jurisdictional limits of this

3  court, but is yet to be ascertained.  Plaintiff will either seek leave to amend this Complaint upon

4  ascertaining such information or will prove the same at the time of trial.

5    102.    As more fully set forth above, the acts of Defendants were intentional, malicious,

6  wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the

7  intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff.

8  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish

9  and make an example out of Defendants.

10                          **EIGHTH CAUSE OF ACTION**

11            **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

12                          **AGAINST ALL DEFENDANTS**

13    103.    Plaintiff alleges and incorporates herein by this reference each and every

14  allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

15    104.    In carrying out the above-mentioned conduct, Defendant TSA and its agents

16  breached a duty owed to Plaintiff to provide a workplace free from unfair treatment,

17  discrimination and retaliation, and abused their positions of authority towards her.  Said conduct

18  exceeded the inherent risks of employment and was not the sort of conduct normally expected to

19  occur in the workplace.

20    105.    Defendants, and each of them, knew or should have known that the above conduct

21  would cause Plaintiff serious emotional distress.  As a proximate result of Defendants' negligent

22  conduct, Plaintiff suffered and will continue to suffer extreme humiliation, embarrassment,

23  mental anguish, and emotional distress in an amount according to proof.

24                          **PRAYER FOR RELIEF**

25    WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as

26  follows:

27    1.  Compensatory and actual damages in an amount to be proven at the time of trial;

28    2.  For costs of the suit incurred herein;

3.  For punitive and exemplary damages in an amount to be proven at the time of trial;

4.  For reasonable attorneys' fees pursuant to 29 U.S.C.A. § 794a;

5.  For pre- and post-judgment interest at the prevailing statutory rates; and

6.  For such other relief as the court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for the causes of action set forth herein.


Dated: July 7, 2014


By: ZACHARY CANTOR, ESQ.
Attorney for Plaintiff TONIA DAVIS

COMPLAINT